UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

GRAND ISLE SHIPYARD, INC. AND                           CIVIL ACTION
THE GRAY INSURANCE COMPANY

VERSUS                                                  NO.  06-1405

SEACOR MARINE, LLC                                      SECTION  "N"  (3)

## ORDER AND REASONS

       Presently before the Court are cross motions for summary judgment filed by Plaintiffs, Grand

Isle Shipyard, Inc. ("Grand Isle") and Gray Insurance Company ("Gray") and Defendant, Seacor

Marine LLC ("Seacor").  (Rec. Doc. Nos. 8 and 10.)  For the reasons stated herein, Grand Isle's and

Gray's Motion for Summary Judgment is **GRANTED** and Seacor's Motion for Summary Judgment

is **DENIED**.

### I.  BACKGROUND

       On or about April 27, 2005, Denny Neil ("Neil") allegedly sustained injuries from falling

about the M/V SEA HORSE IV as he exited the galley and attempted to board Platform 47AQ,

owned and operated by Seacor.  Neil was employed by Grand Isle.  BP American Production

Company ("BP") contracted with Grand Isle to provide repair and maintenance on fixed platforms

on the outer continental shelf pursuant to a Master Maintenance and Construction Services Contract ("MMCSC").[1]

The M/V SEA HORSE IV was an offshore vessel owned and operated by Seacor and provided by Seacor pursuant to a  Vessel Charter Contract with BP.  At the time of the alleged injury, Neil, who had finished work for the day, was traveling as a passenger aboard the M/V SEA HORSE IV to Platform 47AQ, owned and operated by Seacor, where he and the other Grand Isle workers lived.  Neil alleged that he slipped and fell while exiting the galley of the SEA HORSE and attempting to board the platform, sustaining serious injuries.

Neil filed suit against Seacor in the United States District Court for the Southern District of Texas, asserting a claim for vessel negligence under Section 905(b) of the Longshore and Harbor Worker's Compensation Act ("LHWCA").  Seacor subsequently settled the claim with Neil.  Upon the filing of suit by Neil and thereafter, Seacor tendered its defense and indemnity to Grand Isle; in addition, Seacor claimed the benefit of first party liability insurance allegedly owed by Grand Isle pursuant to the terms of the Master Maintenance and Construction Services Contract.[2]  Grand Isle denied Seacor's demand.

---

[1] The MMCSC contains a choice of law provision designating the general maritime law as the governing law when the performance of the contract is "in any way" related to maritime activity.

[2] Seacor seeks indemnity from Grand Isle under paragraph 14.07 of the MMCSC, which reads: Contractor agrees to defend, indemnify, release and hold company's other contractors harmless in accordance with the provisions of this Article 14 (to the extent such other Contractors execute cross indemnification provisions substantially similar to those contained in this section 14.07) from and against all claims, liabilities, damages, and expenses (including without limitation attorney's fees and other costs of defense), irrespective of insurance coverages for the following:

14.07.01(i) all injuries to, deaths, or illnesses of persons in contracted group CG:

. . . whether or not occasioned by or the result in whole or in part of the negligence or fault, whether sole, concurrent, joint, active, or passive, of company's other contractors or any other entity or person or the unseaworthiness of any vessel . . .

(MMCSC, Rec. Doc. No. 8-5, p. 10.)

On March 17, 2006, Grand Isle and Gray filed suit in this Court, seeking a declaratory judgment that: (1) Grand Isle is not contractually obligated to defend and indemnify Seacor; and (2) Seacor is not entitled to first party insurance coverage from Gray. On December 29, 2006, Grand Isle moved for summary judgment. Grand Isle does not dispute that the agreement contains an indemnity provision. Rather, Grand Isle argues that the indemnity and insurance provisions are null and void. In support of this contention, Grand Isle makes two arguments: (1) by virtue of the Outer Continental Shelf Lands Act, 43 U.S.C. 1331, *et seq.*, Louisiana law applies to the case; thus, the indemnity provision is null and void pursuant to the Louisiana Oilfield Indemnity Act ("LOIA"), La. R.S. 9:2780; (2) Section 905(b) of the LHWCA is applicable to the case and prohibits enforcement of the indemnity provision. On the same day, Seacor filed a cross motion for summary judgment, claiming the general maritime law governs the dispute, entitling Seacor to indemnification from Grand Isle. Both parties agree that the determinative inquiry in this contractual and coverage dispute is whether Louisiana law applies, and that resolution of this issue will resolve the cross motions for summary judgment.

## II. LAW AND ANALYSIS

### A. Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment may be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed. R. Civ. P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant. *Anderson*

3

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.*

Initially, the movant bears the burden of demonstrating the absence of material fact issues. *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir. 1993).  The movant is not required, however, to negate the elements of the nonmovant's case.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*citing Celotex*, 477 U.S. at 323).  If the dispositive issue is one for which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its summary judgment burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim.  *Celotex*, 477 U.S. at 325.  If the movant meets his burden, then the burden then shifts to the nonmovant, who, to avoid summary judgment, must go beyond the pleadings and designate specific facts that show that there is a genuine issue for trial. *Little*, 37 F.3d at 1075 (*citing Celotex*, 477 U.S. at 325).  Of course, unsubstantiated assertions do not constitute competent summary judgment evidence.  *Abbott*, 2 F.3d at 619 (*citing Celotex*, 477 U.S. at 324).

Before granting a motion for summary judgment, the district court must be satisfied that no reasonable trier of fact could find in favor of the nonmoving party.  *Anderson*, 477 U.S. at 249; *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (stating that "the facts and inferences [must] point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict").  In determining whether a material issue of fact exists, the evidence and all inferences drawn therefrom must be considered in the light most favorable to the non-moving party.  *Baker v. American Airlines, Inc.*, 430 F.3d 750, 753 (5th Cir. 2005) (*quoting Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005)).

4

**B.  Analysis**

**Nature of the Contract**

The parties disagree on whether the Court should apply Louisiana or general maritime law to interpret the MMCSC between BP and Grand Isle.  Grand Isle contends that by virtue of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, *et seq.*, the law of the adjacent state (Louisiana) applies to this controversy and that Louisiana law, specifically the Louisiana Oilfield Indemnity Act ("LOIA"), La. R.S. 9:2780, renders invalid the indemnity provisions contained in the MMCSC.  The parties agree that if Louisiana law applies, the indemnity provision between Grand Isle and BP cannot survive the dictates of the LOIA.  The key inquiry, thus, is whether the general maritime law or OCSLA applies to this dispute. In order to determine which law applies, the Court must first determine the nature of the contract in question.

In order to determine whether OCSLA applies to a contract and whether the contract is maritime or non-maritime, the Fifth Circuit focuses on three significant factors:  (1)  whether the controversy arises on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto); (2)  whether federal maritime law applies of its own force, and (3)  whether the state law is inconsistent with federal law.  *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990).  This test is known as the *PLT* test, and it is firmly supported in Fifth Circuit jurisprudence as the proper test for deciding whether state law provides the rule of decision in an OCSLA case.  *Hodgen v. Forest Oil Corp.*, 87 F.3d 1512, 1526 (5th Cir. 1996).

**1.  Situs**

Seacor argues that the dispositive issue is whether the vessel was in physical contact with the platform or seabed at the time of the accident.  In making this argument, Seacor is asking the

Court to apply a bright line rule that if there is no physical connection with an OCSLA situs, state law does not apply. However, the Fifth Circuit "does not apply any physical contact rule with the rigidity that [Defendant] would impose." *Hodgen*, 87 F.3d at 1527 (discussing *Hollier v. Union Texas Petroleum Corp.*, 972 F.2d 662 (5th Cir. 1992)).

In this case, it is undisputed that the accident occurred when Neil was aboard the vessel in navigable waters, above the outer continental shelf. At the time of the accident, the vessel was within a few yards of the platform but was not attached to the platform or to any other structure.[3] At the time of the accident, Neil's work for the day was complete, and he was proceeding to the living quarters platform. Neil's work , which consisted mainly of platform repairs and grating repairs, was performed on platforms, not vessels. Neil's sole relationship to the vessel was as a passenger; he did not contribute to the mission of the vessel in any manner. Further, the work tickets from April 7, 2005 to May 7, 2005 demonstrate that the work performed pursuant to the MMCSC was performed on platforms, not on vessels.

In light of the above facts, the Court finds that although the accident did not occur on an OCSLA situs, under *PLT*, the situs requirement has been met in this case because "the locations where substantial work pursuant to the contract was done were covered situses . . . ." *Wagner v. McDermott, Inc.*, 899 F.Supp. 1551, 1556 (W.D. La. Dec. 19, 1994) (*quoting PLT*, 895 F.2d at 1047), *aff'd.*, 79 F.3d 20 (5th Cir. 1996), *cert. denied*, 519 U.S. 945 (1997); *see also Hodgen*, 87 F.3d at 1524; *see also Dennis v. Bud's Boat Rental, Inc.*, 987 F.Supp. 948, 950 (E.D. La. Nov. 18, 1997) ("[T]here is a trend to find OCSLA situs where 'the work required by the contract was performed

---

[3] Despite conflicting statements regarding this issue in the memoranda, the parties later expressed their agreement that the vessel was not moored to the platform.

on an offshore platform' even if situs is not strictly, physically met." (*quoting Wagner*, 899 F.Supp. at 1556)).

## 2. Whether Federal Maritime Law Applies of its Own Force

The Fifth Circuit has held that "deciding whether a contract is maritime and whether maritime law applies of its own force" are identical inquiries for purposes of determining OCSLA applicability in the context of oilfield indemnity disputes, and "both belong as a single factor in the three part PLT test." *Hodgen*, 87 F.3d at 1524-25. In order to determine whether a contract is maritime or not, the Court applies the six-factor test set forth in *Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313, 316 (5th Cir. 1990):

   (1)  What does the specific work order in effect at the time of the injury provide?
   (2)  What work did the crew assigned under the work order actually do?
   (3)  Was the crew assigned to do work aboard a vessel in navigable waters?
   (4)  To what extent did the work being done relate to the mission of the vessel?
   (5)  What was the principal work of the injured worker?
   (6)  What work was the injured worker actually doing at the time of his injury?

*Id.* at 316.

If a contract consists of multiple parts, such as a master service agreement followed by subsequent work orders, the parts must be interpreted together in evaluating whether maritime law applies to the interpretation and enforceability of the contract's provisions. *Id.* at 315. "Determination of the nature of the contract depends in part on the historical treatment in the jurisprudence and in part on a fact-specific inquiry." *Id.* at 316.

Applying the *Davis* factors to the case at bar, the Court concludes that the principal obligation of the BP-Grand Isle contract was non-maritime. The first and second *Davis* factors examine what the specific work order in effect at the time of the injury provides and what work the crew assigned under the work order actually performed. The MMCSC between Grand Isle and BP

provided for maintenance and construction services.  The description of work performed in the various work tickets relates to performing maintenance and repair work on fixed platforms.[4]  While the April 25, 2005 work ticket mentions a "boat," it makes no mention of performing work on the boat; the work ticket merely states that the workers "back loaded [the] boat" after completing the grating work on the platform and cleaning up the work area.  (Rec. Doc. No. 8-12, p. 4.)  To the extent that the workers loaded equipment onto the boat, that job could arguably be considered maritime; however, the Court finds that under these circumstances, such a task is, at most, merely incidental to the primary job of performing maintenance and repair work on the fixed platforms.  While the work tickets do make several references to safety meetings, there is no evidence that any of these safety meetings concerned vessel safety.  The work tickets attached to Grand Isle's memorandum and described, in part, herein, sufficiently demonstrate that the work actually completed by the Grand Isle crew under the work orders were not maritime in nature.  Further, the Grand Isle crew conducted actual work on the platforms and performed little to no work on the vessel itself.  The vessel, rather, was used as a mode of transporting the employees to and from the

---

[4]  For example, the work ticket dated April 7, 2005 lists for its "description of work" "Cleaned up platform, put up spool's [sic] for life raft's [sic]. (Rec. Doc. No. 8-9, p. 1.)  The work ticket dated April 8, 2005 recites: "Put in bracing for gas lift header . . . stage equipment." *Id.* at p. 2.  The work ticket dated April 9, 2005 recites: "Install meter run on gas lift and scrap old piping."  *Id.* at p. 3.  The work ticket dated April 10, 2005 recites: "Weld plates for hatch covers, modify support brace for gas lift header." *Id.* at p. 4.  The April 11, 2005 work ticket recites: "Rigged up to surg tank and pulled to top deck, cleaned up old pipe and threw away."  *Id.* at p. 5.  The April 12, 2005 work ticket provides: "Cut angle iron for pollution ring on top deck."  *Id.* at p. 6.  The April 13, 2005 work ticket states: "Weld on hatch cover for well bay, weld on containment ring."  *Id.* at p. 7.  The April 21, 2005 work ticket recites: "Crew change, BP safety meeting, ISEA, Demo 4" jet wash line, working on taking down air intake boxes under white compressor, clean up work area." (Rec. Doc. No. 8-11, p. 3.)  The April 23, 2005 work ticket provides: "06:00 BP safety meeting, ISEA, work on fabbing stand for M-2 and M-3, clean up work area." *Id.* at p. 6.  Similarly, the April 24, 2005 work ticket recites: "06:00 BP safety meeting, ISEA, welding on stands for M-2 & M-3." (Rec. Doc. No. 8-12, p. 3.)  The work ticket dated April 26, 2005 recites: "06:00 BP safety meeting, ISEA, laying grating over old plate on deck, clean up work area." (Rec. Doc. No. 8-13, p. 1.)  On April 27, 2005, the date of the alleged injuries, the work ticket contains the following description of work done: "06:00 safety meeting, ISEA, laying grating and welding down, welding down pollution barrier, clean up work area."  *Id.* at p. 3.

8

platforms and the living quarters.  In light of these facts, the Court finds that the first and second *Davis* factors weigh in favor of Grand Isle.

The third *Davis* factor, which examines whether the crew was assigned to do work aboard a vessel in navigable waters,  also weighs in favor of Grand Isle.  As mentioned above, the Grand Isle crew regularly traveled to and from the platform and the living quarters in Seacor vessels; however, no contract specifically assigned the Grand Isle crew to a vessel.

The fourth *Davis* factor, the extent to which the work being done related to the mission of the vessel, also weighs in favor of Grand Isle.  There has been no evidence presented that the mission of the M/V SEA HORSE IV was anything other than to provide transportation to and from platforms.  The evidence presented by both Plaintiffs and Defendant demonstrates that the only need for a vessel was to transport Grand Isle's employees to and from platforms.

The fifth *Davis* factor, which relates to the principal work of the injured worker, also weighs in favor of Grand Isle.  In this case, the evidence examined above, including the work tickets and MMCSC, demonstrates that the principal work of the Grand Isle crew in general, and Denny Neil in particular, involved maintenance and repair work on Seacor platforms.  Seacor has put forth no evidence indicating that Neil engaged in any kind of work other than maintenance, repair, and construction work on fixed platforms; in contrast, Grand Isle sets forth deposition testimony demonstrating that the Grand Isle crew was engaged only in work on platforms.[5]

---

[5]  Q.  While working for GIS, did you ever do any work on boats?
     A.  Work on boats, no.
(Neil Deposition, Rec. Doc. No. 8-4, p. 2.)

The sixth *Davis* factor examines the activities of the injured worker at the time of his injury. At the time of the accident, Neil was finished with his work for the day and was traveling on the vessel as a mere passenger on his way from the work site to the living quarters.[6] When Neil slipped and twisted his ankle, he was exiting the galley of the vessel in an attempt to disembark the vessel. As such, the Court finds that Neil was not engaged in any conduct that would weigh in favor of applying maritime law to the contract at issue in this case.

Accordingly, the Court finds that the contract at issue in this case, the Master Maintenance and Construction Services Contract between BP and Grand Isle, is non-maritime.

### 3. Consistency of State and Federal Law

The third factor of the *PLT* test is whether the provisions of state law are inconsistent with any provision of federal law. Pursuant to OCSLA, the law of the adjacent state, Louisiana, supplies the rule of decision. The Fifth Circuit has specifically held that "nothing in the LOIA is inconsistent with federal law." *Hodgen*, 87 F.3d at 1529.

Because the Court finds that Louisiana law applies in this case pursuant to OCSLA, the indemnity provision in the BP-Grand Isle contract is null and void pursuant to the LOIA, and Seacor's claim to additional assured endorsements from Grand Isle is likewise without merit. *See Hodgen*, 87 F.3d at 1529 (*citing* La. R.S. § 9:2780.B., G.)

---

[6] Q. You were just a passenger on this Seacor boat, right?
   A. That's correct.
   Q. You weren't doing any rigging on the boat, right?
   A. That's right.
(Neil Deposition, Rec. Doc. No. 8-4, pp.5-6).

### III.  CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Grand Isle's Motion for Summary Judgment is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Seacor's Cross-Motion for Summary Judgment is hereby **DENIED**.

New Orleans, Louisiana, this  _26th_  day of September, 2007.

**KURT D. ENGELHARDT**
**United States District Judge**

11